**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD J. MEISTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No.  3:23 C 50055** |
| | ) | |
| **ROCKFORD PUBLIC SCHOOLS,** | ) | **Judge Rebecca R. Pallmeyer** |
| **DISTRICT 205,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Richard J. Meister worked as a bus and diesel mechanic for the Board of Education of the Rockford Public Schools, District No. 205 from June 1, 2018, until his resignation on September 12, 2022.  After filing a timely EEOC charge, Meister brought this action against the Board, alleging claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq*., largely relating to the conduct of Meister's supervisor, William Fare—conduct Meister claims was so severe that it prompted his resignation.[1]

Defendants have moved for summary judgment, arguing that most of Plaintiff's claims are time-barred and that the evidence in support of those that are timely is insufficient to create a dispute of material fact in support of those claims.   As explained below, the motion is granted.

---

[1]      Plaintiff's complaint alleged "discrimination in violation of the ADA" (Count I), "retaliation in violation of the ADA" (Count II), and "constructive discharge" (Count IV).  Judge Reinhard of this court dismissed Count III, a Title VII retaliation claim, as unsupported by Plaintiff's underlying EEOC charge [44].   Count I's allegations appear to address both a hostile workplace claim and a failure to accommodate claim, and those claims are analyzed separately in this opinion.

## BACKGROUND

The court sets forth the facts as presented in the parties' Rule 56.1 statements and responses therein, drawing inferences in favor of Plaintiff Meister as required by Rule 56. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

I. **Meister's Conflicts with Supervisor Fare**

Richard Meister began working as a bus and diesel mechanic for Defendant Board of Education of the Rockford Public Schools, District No. 205, on June 1, 2018. (Def.'s Local Rule 56.1(a)(2) Statement of Material Facts (hereinafter "DSOF") [70] ¶ 9.) Plaintiff's direct supervisor was William "Bill" Fare, who managed all employees in the garage. (Plaintiff's Rule 56.1(b)(3) Statement of Additional Material Facts (hereinafter "PSOF") [83] ¶ 1.) Walter Smith was at that time the garage's dayshift foreman. (Am. Compl. [16] ¶ 29.) All employees in the garage, including Fare, were overseen by Michael Slife, the School Board's Executive Director of Transportation. (DSOF ¶ 15; Phillips Dep. [70-7] at 22:9–22:18.)

In 2019, Plaintiff began experiencing difficulty speaking, and was diagnosed with Primary Lateral Sclerosis ("PLS"), a rare neurogenerative disease that affects the brain's upper motor neurons. (Pl. Dep. [70-1] at 36:8–36:24.) In 2020, Plaintiff received a revised diagnosis of Amyotrophic Lateral Sclerosis ("ALS"), a more severe form of the disease that harms both the upper and lower motor neurons in the brain. (*Id.* at 36:8–13.) ALS is a progressive terminal disease that affects muscle control and can result in speech impairment. (DSOF ¶ 14.) Slife testified that he learned of Plaintiff's diagnosis on June 17, 2019, but had become aware of Plaintiff's difficulty speaking before then. (Pl. Resp. to DSOF [87] ¶ 16.) Fare testified that he considered Plaintiff a person with "special needs" as a result of his disability. (*Id.* at ¶ 19.)

Plaintiff alleges that Fare and other supervisors mistreated him due to his ALS. The first instance of alleged misconduct occurred during a morning shift meeting on February 13, 2020. (DSOF ¶ 17.) While reading from a piece of paper, Fare stumbled over his words, and suggested that Plaintiff read it instead. (*Id.*) Fare laughed as he made the suggestion, poking fun at Plaintiff's

speech impediment. (*Id.*) Plaintiff does not recall anyone else at the meeting laughing at the comment (*id.* ¶ 18), but Plaintiff found it "humiliating," and said his "head dropped" when he heard it. (Pl. Resp. to DSOF [87] ¶ 17.) Fare later claimed that he did stumble over his words on that occasion, but invited "everyone to read," and was not poking fun at Plaintiff. (Fare Dep. [70-8] at 77:13-18).

On a second occasion, Fare and the others made grunting noises to mock people with "special needs." (PSOF ¶ 10, 22.) Defendant acknowledges that this event happened, but disputes that the comments were directed towards Plaintiff. (Def. Resp. to PSOF [87] ¶ 10.) Instead, Fare claims that he "joined in" after hearing other employees making the noises, and that Plaintiff himself made the same noises after walking into the room. (Fare Dep. [70-8] at 44:19–45:16.) Neither party has identified the date for this incident.

On a third occasion, Plaintiff was told by several coworkers that they had heard Fare making fun of Plaintiff. (Pl. Resp. to DSOF ¶ 19; Pl. Dep. [70-1] at 74:7–76:10.) Plaintiff testified that Fare told the coworkers that Plaintiff talked "like a retard" and used grunting noises and arm movements to make fun of him. (Pl. Dep. [70-1] at 74:7–76:10.) Plaintiff could not recall whether this incident took place before or after the February 13 incident. (*Id.*)

In March 2020, the Rockford Public Schools shut down in response to COVID-19, and employees were required to clock in remotely. (PSOF ¶ 3.) Plaintiff and many of his coworkers experienced difficulties using the virtual clock-in system. Plaintiff contends that Fare "wrote him up" for failing to clock in, singling him out for discipline despite other employees having had similar problems. (*Id.* at ¶¶ 4–5.) Plaintiff has not presented any such writing, and it appears he is referring to a verbal reprimand. Defendant disputes that there was any write up; Slife testified in a deposition that he reviews all written discipline, and that Plaintiff was never officially disciplined for the issue. (Slife Dep. [70-2] 34:21–35:8.) Plaintiff evidently believes discipline should have been memorialized. At some point he asked Slife for his "signed verbal," and Slife responded that

he did not know what Plaintiff meant.  (PSOF ¶¶ 8–9.)  The garage returned to in-person work around the beginning of the 2020-21 school year.  (*Id.* ¶ 3.)

Plaintiff contends that Fare and others were abusive in other instances, as well, several of them unrelated to Plaintiff's disability.  For example, on December 17, 2020, Fare called a "pallet meeting" to discuss RPS's COVID-19 testing protocols.  (DSOF, Ex. 4 [70-4] at 2.)  Fare informed the employees that school district staff would start mandatory daily COVID-19 tests at a nearby location.  (*Id.*; Pl. Dep. [70-1] at 91:12–92:22.) According to Plaintiff, Fare then "explained why he will not be getting tested and went into how the red blood cells and the white blood cells work."  (DSOF, Ex. 4 [70-4] at 2).  Plaintiff later stated that he was "very offended" by these comments.  (Pl. Dep. [70-1] at 92:22.)  At the same meeting, an employee asked Fare to buy tacos for the staff.  (PSOF ¶ 20.)  Fare responded by grabbing his crotch area and saying, "I have your tacos bitch!"  (*Id.*)

On another occasion (neither party has identified the date), Plaintiff was repairing a new bus with a coolant leak, and Smith objected to his putting new (rather than used) coolant in the bus. (PSOF ¶ 12.)  Plaintiff testified that Smith used coarse language, calling Plaintiff "fucking stupid" and a "fuckin' idiot."  (*Id.*)  Fare and Slife witnessed this incident, but neither corrected the behavior at the time.  (*Id.*)  Slife later acknowledged to Plaintiff that Smith's behavior was inappropriate and, according to Plaintiff, assured him that Smith would be removed as a lead worker.  (*Id.* at ¶ 15.)  Defendant denies that Slife made such a commitment, and it is undisputed that Smith was never removed as a lead person and continued using coarse language until Plaintiff left his employment.  (Def.'s Resp. to PSOF ¶ 15.)  Slife acknowledged that Smith was never disciplined for using inappropriate language toward Plaintiff.  (PSOF ¶ 16; Slife Dep. [70-2] at 49:14–50:1.)

Plaintiff testified that as of late December 2020, he qualified for a $3.00 per hour pay increase for time spent working as the senior technician on duty.  (PSOF ¶ 17.)  After working for over 20 hours in this role, he noticed that his pay stubs did not reflect the increased pay.  (*Id.*)

4

Plaintiff claims that he raised the issue with Fare and Fare's assistant multiple times, but the issue was not corrected until Plaintiff directly emailed Fare. After that email communication, the issue was corrected immediately. (PSOF, Ex. G [83-7].)

Plaintiff also recalls an incident on January 27, 2021, when he took the initiative to repair the garage's bus wash, but Fare directed him to stop doing so. (PSOF ¶ 18.)[2] Plaintiff evidently had no other pending assignments, but when he asked whether Fare would rather that Plaintiff "twiddl[e] his thumbs" instead, Fare allegedly responded, "I don't care, but don't work on this." (*Id.*) Around the same time, when the mechanics tried to diagnose an electrical issue on new buses, Plaintiff spent much of a day trying to uncover the issue, and he believed he had diagnosed it. (*Id.* at ¶ 19.) Plaintiff felt proud of his accomplishment and showed Fare his results, but Fare simply looked at Plaintiff's proposed solution, said "No, that's not it," and walked away. (*Id.*)

## II.     Events Including and Following Defendant's Investigation of Fare

In early 2021, Plaintiff made official complaints regarding Fare's misconduct, and Defendant commenced an internal investigation. (DSOF ¶ 22–24, 29–31.) Plaintiff met with Bridget Cheek, identified by Defendant as an "HR generalist," and Jeff Hursh, Plaintiff's coworker and union representative, to discuss Fare's misconduct. (*Id.* ¶¶ 22–23; Pl. Dep. [70-1] at 25:21–64:4.) Cheek requested that Plaintiff submit statements describing Fare's conduct, and Plaintiff did so, submitting two letters, each dated February 4, 2021. (DSOF ¶¶ 24–25.) One letter recounted the February 13, 2020 mocking incident, and the other described the December 17, 2020 "taco" incident. (*Id.* ¶¶ 25–26.) Cheek received the letters on February 5, 2021, and sent copies of them to Aaron Lockhart, an investigator employed by Defendant. (*Id.* ¶¶ 28–29.) Lockhart then began to conduct an internal investigation. (*Id.* ¶ 30.)

---

[2]     Defendant's 56.1 Statement refers to this incident as occurring after a February 2021 Human Resources report (described below), but Plaintiff's 56.1 Statement and Plaintiff's Response to Defendant's 56.1 Statement date the event in January. (PSOF ¶ 18.)

In their interviews with Lockhart, garage employees described Fare as a hostile, vindictive, and offensive supervisor. (DSOF, Ex. 5 [70-5].) Several employees mentioned that Fare was "hardheaded" and "a bully," and that he frequently threatened to fight his subordinates whenever they disagreed with him. (*Id.* at 3–5.) One employee stated that he felt that Fare "creates a hostile work environment," and another pointed out that Fare "swears a lot and has said things about his penis." (*Id.* at 3–4.) According to the report, Slife (Fare's supervisor) reported that Fare had also made threatening comments towards certain political groups, such as "if Antifa or the Black Lives Matter group ever shows up at my house, I'll pull out my gun and won't stop shooting." (*Id.* at 9.) Lockhart's final report, dated March 9, 2021, states that at least three of Plaintiff's coworkers— including Hursh and Smith—corroborated Plaintiff's account of the February 13 and December 17 incidents. (*See id.*; DSOF ¶ 32.) The report also notes that another garage employee, Jeff Baldridge, stated that he knew of Fare "making fun of 'retarded people' by making noises and 'putting his hands out like a special needs' person would do.'" (DSOF ¶ 33.)

On February 12, 2021—apparently while the investigation was still ongoing[3]—Defendant issued a written reprimand to Fare for "inappropriate and unprofessional communication to staff." The report notes three instances of misconduct: the February 13 and December 17 incidents, and Fare's repeated threat towards his staff to "go across the street and settle it." (DSOF, Ex. 5 [70-5] at 15.) The reprimand ordered Fare to refrain from engaging in offensive conduct and to communicate professionally with his staff. (DSOF ¶ 35.) Fare received and signed the report on February 12. (*Id.* at ¶ 36.)

---

[3]      According to the investigator's report, Fare was reprimanded on February 12, but he was not interviewed until February 26, two weeks after he was presented with the results of the investigation. (*See* DSOF, Ex. 5 [70-5].) Assuming the dates in the report are accurate, the parties have not explained why Fare's interview was conducted so long after he was presented with its results.

Two weeks later, on February 26, 2021, Cheek, Lockhart, and Slife interviewed Fare.[4] (PSOF ¶ 37.) Cheek's notes from the meeting state that Fare claimed that Plaintiff was becoming "more hostile" about his ALS, and that his ALS was "going to cause problems" if it is debilitating. (*Id.* at ¶ 38.) Fare also denied poking fun at Plaintiff's speech impediment during the February 13 meeting. (DSOF, Ex. 5 [70-5] at 12.) He also denied making an inappropriate gesture with respect to the "taco" incident. (*Id.* at 13.)

After the investigation, Fare continued as Plaintiff's supervisor and, Plaintiff believes, retaliated against him. (PSOF ¶¶ 35, 36.) In one incident on March 18, 2021, a document detailing upcoming work assignments was distributed prematurely. (*Id.* ¶ 40.) Plaintiff raised this issue to Fare's secretary, and Fare "stepped in."[5] (*Id.*) On March 19, Slife wrote an email about the incident to Cheek and Michael Phillips, the Chief Operating Officer of the school district, addressing the issue Plaintiff brought up with Fare's secretary. (PSOF, Ex. 12 [83-12].) In this email, Slife stated he was starting to wonder if Plaintiff was "bullying" Fare because "some of the things [Plaintiff] brings up are totally his opinion and just false." (PSOF ¶ 41–42.) When questioned about this at his deposition, Slife testified that he was not certain about whether

---

[4]      Defendant objects to the introduction of Cheek's notes to support Plaintiff's allegations on hearsay grounds. If Cheek testified consistently with her report, her findings may be admissible under Rule 801(d)(2)(D) as the statement of an opposing party' "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." FED. R. EVID. 801, 28 U.S.C.A; *see also Mister v. Northeast Illinois Commuter R.R. Corp.*, 571 F.3d 696, 698-99 (7th Cir. 2009) (holding that a report made by the defendant employer's safety officer concerning the plaintiff employee's fall, in which other employees were interviewed about the fall, was admissible under 801(d)(2)(D) because the safety officer was an employee acting in the "usual course of business"). Cheek's notes also include statements of others (hearsay within hearsay). (Def.'s 56.1 Response ¶ 38.) Though likely not admissible for the truth (that Fare made these statements), the court may nevertheless consider Cheek's notes as evidence that Defendant had notice of Fare's thoughts and attitude toward Plaintiff. FED. R. EVID. 801; *see Talmage v. Harris*, 486 F.3d 968, 975 (7th Cir. 2007).

[5]      Both sides acknowledge that the premature distribution of the list took place; but neither party indicates what actions Fare took when he "stepped in." (Def. Resp. to PSOF [87] ¶ 40.)

Plaintiff was bullying Fare, and claimed that he never asked anyone to investigate Plaintiff.  (*Id.* ¶ 42; Slife Dep. [70-2] at 102:22–103:4.)

The next day, on March 19, 2021, Plaintiff alleges that Fare's secretary "threw" a document at him.  (PSOF ¶ 43.)  The incident arose after Fare told Plaintiff to take a bus to an outside dealership for warranty work.  (*Id.*)  The dealership asked Plaintiff for a phone number, but Plaintiff did not have his workplace's phone number memorized, so he gave the dealership his personal phone number instead.  (*Id.*)  The next day, an employee of the dealership called, and Fare's secretary "flung the contact information back at [Plaintiff]", stating "I don't care about this.  It wasn't me.  Why did she call you?  You should have given her our phone number."  (*Id.*)  On April 6, 2021, Fare emailed Slife about this incident, writing that Plaintiff had a "trend" of "having trouble remembering."  (*Id.* at ¶ 44.)  Fare later testified he was "speculating" in the email that Plaintiff had memory issues.  (*Id.*)

On April 1, 2021, Plaintiff asked Fare and Slife for permission to take his lunch and other breaks on a flexible schedule so he could contact his doctors and make other medical-related calls.[6]  (*Id.* at ¶ 46.)  Plaintiff noted in his request that James Olson, a coworker, took breaks at different times than the other mechanics, and Plaintiff wanted to do the same himself.  (*Id. at* ¶47.).  In emails discussing Plaintiff's request, Slife expressed an openness to a flexible break schedule, but Fare was skeptical.  Later, Fare responded to Plaintiff, stating that "at this time we will not be flexing our break time," ostensibly denying his request.  (Pl. Resp. to DSOF, Ex. K [82-11].)  When Plaintiff pointed out that other employees were allowed to choose their own break times, Fare told him to "not concern yourself with the actions of another employee."  (*Id.* at 3.)  Strangely, Slife later testified that the garage's policy at the time already allowed employees to take breaks on a flexible schedule, meaning that Plaintiff "could already do what he was

---

[6]      Plaintiff later testified that he could have contacted his doctors during other times, and that he only wanted a flexible break schedule because other employees took flexible breaks. (Def.'s 56.1 Response ¶ 46.)

requesting to the extent that he was requesting it."  (Stife Dep. [70-2] at 129:11–13, 129:23–24).

As the garage apparently had a policy allowing for flexible breaks, it is not clear why Slife and

Fare denied Plaintiff's request.  Neither was able to explain this during their depositions.

On April 29, 2021, Slife emailed Plaintiff, alleging that he had received "a report through

the chain" that Plaintiff had refused to work and was in a "bad mood."  (Pl. Resp. to DSOF, Ex. 7

[82-7].)  Slife requested Plaintiff's side of the story, noting that "I am hoping that if you are needing

help with a job or if there is an issue you are using your other team mates/mechanics . . . ." (*Id*).

Slife also noted that he saw Plaintiff using the wrong tool (a reciprocating saw) while working on

a bus, and asked why Plaintiff did not use the proper tool (a torch) instead.  (PSOF ¶¶ 54–55.)

Later that day, Plaintiff met with Slife to discuss the accusations, and Plaintiff explained that his

use of the saw was proper, given that using a torch on certain kinds of buses creates a risk of

explosion.[7]  (*Id.* ¶ 56.)  According to Plaintiff, Slife told him that these "false accusations" had

come from Fare, and that Slife was going to address the issue with Fare.   (*Id.* ¶ 56.)  In an April

29 email discussing the incident, Plaintiff told his union representative that if "I don't see changes

or I don't see a concrete plan for changes in writing, I will be filing a formal complaint against Bill

[Fare] for lying." (*Id.* ¶ 59.)

On May 7, 2021, Plaintiff emailed Fare to request sick leave for a medical procedure.

(DSOF ¶ 39; DSOF Ex. 6 [70-6] at 2.)  Fare responded by email that same day, advising Plaintiff

that "sick time does not require advanced notice or authorization unless an extended leave is

needed, the only notice needed is one hour before start time per contract."  (DSOF ¶ 40; DSOF

Ex. 6 [70-6] at 2–3.)  For reasons he has not explained, Plaintiff interpreted this response as

rejecting his request, and believed that Fare was requiring him to "call in sick the next morning

---

[7]        Plaintiff cites two of his own text messages to prove that "Meister texted Slife and
he and Slife met to discuss the allegations made by Slife in his email."  (PSOF ¶ 56.)  Defendant
objects to the use of these messages as hearsay.  (Def. Resp. to PSOF, ¶ 56.)  Hearsay aside,
the court notes that the text messages Plaintiff cites consist of Plaintiff's requests for a meeting—
not evidence that a meeting took place.

before my procedure." (DSOF Ex. 6 [70-6] at 1.) He contacted Slife, reporting that his request had been denied, and sent a second email to Fare to ask if he could "pre-arrange the day off." (Pl.'s Resp. to DSOF ¶¶ 41, 46.) Later that same day, Fare sent a second email to address the confusion, clarifying that Plaintiff could arrange sick time in advance but that it was not necessary to seek advance permission. (DSOF ¶ 42; DSOF, Ex. 6 [70-6].) Based solely on his personal impressions of Fare's writing style, Plaintiff believes that Slife helped Fare prepare this second email. (DSOF ¶¶ 43, 46; Pl.'s Resp. to DSOF ¶ 46.) He now acknowledges that nothing about the second email constitutes a denial of his request for leave, and testified that Slife later assured him that everything was "taken care of." (DSOF ¶ 44; Pl.'s Resp. to DSOF ¶ 45.)

Also on May 7, 2021, Fare evaluated Plaintiff's work performance without input from other supervisors. (PSOF ¶ 63.) As compared to Plaintiff's prior evaluation, his performance rating for "cooperation" declined from 4 to 3, for "professional demeanor" from 4 to 3, and for "interpersonal relationships" from 4 to 2. (Id.) In his deposition, taken more than three years later, Fare testified that he could not remember the reasons for the evaluations. (Def.'s Resp. to PSOF ¶ 63.) With respect to the matter of "interpersonal relationships," Fare's written notes explained that Plaintiff "[n]eeds to explain the why behind objections to ideas in group or individual settings, needs to be open to others' ideas even if you disagree with theirs." (PSOF ¶ 63.) Fare assessed Plaintiff's performance as having improved with respect to "quantity of work" and "job knowledge," and although Plaintiff's overall evaluation decreased from 4 to 3, Fare still rated him as "exceeds requirements." (Id. at ¶ 64.)

On June 9, 2021, Plaintiff sent a message through Defendant's "Let's Talk" system to indicate he was upset at the way Fare treated his employees. (Id. at ¶ 65.) The next day, Phillips reached out to Plaintiff, checking to see whether Plaintiff had discussed his concerns with Slife. (Id. at ¶ 66.) Plaintiff responded that Slife was aware of Fare's conduct and had done little to address it. (Id.) On June 15, 2021, Plaintiff met with Phillips and Silfe to address the various issues that Plaintiff had experienced at work over the preceding two years. (Id. at ¶¶ 69–70.)

Plaintiff later stated in a deposition that Phillips "heard [him] out and he listened to everything," but neither Phillips nor Slife followed up with Plaintiff about the allegations made in the meeting, or any subsequent discipline. (*Id.* at ¶ 70–72.).

Ten days later, on June 25, 2021, Defendant placed Fare on leave, and he never returned to work. The reasons for his departure are disputed—Fare, Slife, and Phillips each tell a different story. (DSOF ¶¶ 51–55.) All agree that Fare's departure was rooted in an altercation with an employee on the property of Muller-Pinehurst, one of the garage's vendors. (DSOF ¶ 52; Pl. Resp. to DSOF 20 52.) According to Phillips, Fare learned that a garage employee had been simultaneously working a second job at Muller-Pinehurst. (Phillips Dep. [70-7] at 9:10–14; 21:13–24; 22:1–8.) Fare, who evidently was upset at this arrangement, traveled to the vendor's location and verbally confronted the employee. (*Id.*) Fare acknowledges that he was present at the altercation, but contends that Slife was also present, and that it was Slife—not Fare—who confronted the employee. (Fare Dep. [70-8] at 141:5–142:14.) Slife disputes this account, and denies being present during the altercation. (Slife Dep. [70-2] at 152:4–14.)

Defendant gave Fare the option to resign or be fired, and Fare chose to resign. (DSOF ¶ 53; Pl. Resp. to DSOF ¶ 53.) Aside from deposition testimony, the only written record dealing with Fare's resignation produced by the parties is a one-page, hand-written resignation statement, "effective 9-2-21" signed by Fare, stating no reason for his departure. (DSOF, Ex. 9 [70-9].) He remained on paid leave until September 2, 2021, the date his resignation went into effect. (DSOF ¶ 55.) It is not clear why Fare was allowed to remain on paid leave for several months—according to Phillips, this was because of a "discussion . . . between HR and legal to determine how that situation was handled." (Phillips Dep. [70-7] at 26:11–26:22.) Regardless, he did not return to the workplace during this time, and had no further contact with Plaintiff. (*Id.* at 26:11–13; Pl. Dep. [70-1] at 144:11–13.)

Plaintiff, who remained on the job the entire summer, was never informed that Fare had resigned from his position. According to Plaintiff, he simply "disappeared." (Pl. Dep. [70-1] at

11

26:1–26:2).  According to Plaintiff, at first, the garage employees assumed he was away working his usual summer job.  Later, he notes that he heard a "rumor" from a coworker that Fare "was being forced to undergo some sort of HR training or something."  (Pl. Dep. [70-1] 180:10–15); Pl. Aff. [82-8] ¶ 38–39).

## III.  Events Following Plaintiff's Short Term Disability Leave

Plaintiff began short term disability leave from his employment on September 13, 2021, and he never returned to the workplace.  (DSOF ¶¶ 58–59.)  While Plaintiff continued communicating with some of his coworkers who were friends following his disability leave, none of them addressed his disability or said anything that offended him.  (*Id.* ¶¶ 61–62.)

Some ten months into his disability leave, in July 2022, Plaintiff contacted Defendant's HR department to request reimbursement for safety glasses he had purchased while on leave.  (*Id.* ¶ 63; PSOF ¶ 77.)  Defendant's employee Sarah Jeske responded that Defendant would not provide reimbursement because the eyeglasses were not required for his job, as Plaintiff was not working at the time.  (Pl.'s Resp. to DSOF ¶ 65.)  Jeske assured Plaintiff that Defendant would assist Plaintiff in receiving his tool allowance if he returned to work.  (*Id.*)  Defendant denies it had ever granted a tool allowance for an employee on leave.  (Def.'s Resp. to PSOF ¶ 77.)  Plaintiff nevertheless believes that Defendant denied this reimbursement request in retaliation for his February 2021 complaints against Fare.  (DSOF ¶ 66.)   In support, Plaintiff pointed out that Defendant had previously continued his tool allowance while on vacation, for example, and that breaks from work would normally not accompany a cessation in tool allowance.  (PSOF ¶ 77; Pl. Resp. to DSOF ¶ 66.)  Plaintiff also alleges that Phillips and Slife were involved in denying his allowances.  (Pl. Resp. to DSOF ¶ 67.)  On July 21, 2022, Plaintiff emailed Phillips to state that Defendant had denied him benefits and to complain about the prior instances of harassment at the hands of Fare.  (PSOF ¶ 78.)

Plaintiff also believes that Defendant discriminated against him by not offering accommodations to help him return to work from his leave.  (DSOF ¶ 68.)  Plaintiff never requested

these accommodations; instead, for unclear reasons, he expected Defendant to contact him about taking a desk job. (*Id.* ¶ 69.) He acknowledges that he never searched for job openings within the school district, and admits, further, that he did not request accommodations that would facilitate his return from leave. (DSOF ¶¶ 70–71.) He contends that he has "exhausted his tries to initiate" accommodations, pointing to his previous requests for flexible break times and reporting of Fare's harassment. (Pl.'s Resp. to DSOF ¶ 69; Pl. Dep. [70-1] at 209:15–21.)

On September 12, 2022, Plaintiff resigned from his position with Defendant. (Pl. Resp. to DSOF ¶ 72.) Plaintiff filed a discrimination complaint against Defendant with the EEOC on November 8, 2022, and received a right-to-sue letter. (*Id.* at 73; Am. Compl. [16] ¶ 13.) He filed this action on February 2, 2023. (Compl. [1].) The court dismissed one of the four counts in his complaint[8] [44] and discovery proceeded. Defendant's motion for summary judgment on the surviving counts [68] is now before the court.

## DISCUSSION

In moving for summary judgment, Defendant argues that Plaintiff's claims are barred by the ADA's statute of limitations, and that Plaintiff's factual allegations are insufficient to support a claim of discrimination or retaliation. The court addresses each of these arguments below.

### I.     Standard of Review

The court will grant a motion for summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the evidence is insufficient to establish an essential element of the non-movant's claim, at which point all other facts are rendered immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the non-moving party must provide evidence showing there is more than simply a "metaphysical

---

[8]     Pursuant to an order by this court's Executive Committee, this case was reassigned from Judge Reinhard to Judge Pallmeyer on September 10, 2024. (*See* [65].) Prior to reassignment, Judge Reinhard granted a motion to dismiss [28] Plaintiff's Title VII retaliation counts, but otherwise denied the motion. (*See* Op. [44].)

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Summary judgment is the "put up or shut up" moment, at which Plaintiff bears the burden of responding to a properly supported motion with evidence that there is genuine dispute of material fact on this issue. *Harney v. Speedway SuperAmerica LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

## II.    Analysis

Plaintiff's Complaint alleges three violations of federal law: "discrimination in violation of the ADA" by way of a hostile work environment and a failure to accommodate (Count I), "retaliation in violation of the ADA" (Count II), and "constructive discharge (Count IV). (Am. Compl. [16] at 7–9.)

### A.    Hostile Work Environment

To state of claim of discrimination on the basis of hostile work environment, a plaintiff must show (1) that they were subject to unwelcome harassment; (2) the harassment was based on their disability, (3) the harassment "was so severe or pervasive as to alter the conditions of employment and create a hostile or abuse working environment;" and (4) there is a basis for employer liability. *See Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017). As evidence in support of his claim of discrimination, Plaintiff points to Fare's harassment, the denial of his request for flexible breaks, the "false accusations" against him, and other disagreements with his supervisors. (Opp. [81] at 15–16.) Defendant argues these claims are time-barred and, alternatively, insufficient to survive summary judgment. (*See generally* Mem. [69].)

First, the matter of timeliness: In Illinois, a charge of discrimination in violation of Title VII must be filed within 300 days of the date of the alleged discriminatory acts. *Id.*; 42 U.S.C. § 2000e–5(e)(1).[9] Because the ADA's language incorporates § 2000e–5 of Title VII, ADA claims

---

[9]    Because Illinois "is classified as a deferral state," Title VII's ordinary 180-day deadline is extended to 300 days. *See Herr v. City of Chicago*, 447 F. Supp. 2d 915, 918 (N.D. Ill. 2006) (citing 42 U.S.C. § 2000e–5(e)(1)).

must also be filed within 300 days after the alleged "unlawful employment practice." *Stepney v. Naperville School Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004). The parties in this case agree that for Plaintiff, whose EEOC charge was filed on November 8, 2022, the statute of limitations bars the consideration of any discriminatory acts that occurred prior to January 12, 2022.[10]

The impact of the statute of limitations on a particular case depends on the kind of harm alleged. If a plaintiff alleges a discrete discriminatory act—such as "termination, failure to promote, denial of transfer, or refusal to hire"—each discriminatory act is viewed as occurring separately from one another. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–114 (2002). This means that any harassment or discrimination that occurs outside of the statute's 300-day window is time-barred, and not actionable. On the other hand, in cases involving a hostile work environment, the discriminatory act "cannot be said to occur on any particular day"—the statute is violated based on a continuous series of acts that occur over a long period of time. *Id.* at 115. Because of this, a hostile work environment claim *can* be predicated on discriminatory acts that occurred prior to the 300-day window, even if those same acts would be time-barred under a different theory, so long as the wrongdoing continues into the relevant time frame. *See id.* at 115–118. This is referred to as the "continuing violation doctrine." *Banks v. General Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023).

This is not to say, however, that all instances of harassment or discrimination by an employer are cognizable, regardless of the time or nature of the violations. Each predicate act in a hostile work environment claim must be part of the same "unlawful employment practice," meaning that they must bear some relation to one another. *See* 42 U.S.C. § 2000e–5(e)(1). In *Morgan*, the Supreme Court clarified that "certain intervening action[s]" could break the chain of

---

[10] Plaintiff's EEOC complaint was signed on November 8, 2022. [70-11.] As Defendant points out, 300 days before that date is January 12, 2022. (Mem. [69] at 10–11.) Plaintiff does not object to this date in his briefing. (*See generally* Opp. [811].)

a hostile work environment claim, and that acts with "no relation" to each other could not be grouped together into the same employment practice. 536 U.S. at 118.

In *Ford v. Marion Cnty Sherriff's Off.*, 942 F.3d 839 (7th Cir. 2019), the Seventh Circuit elaborated on this principle, identifying several factors that are relevant in determining whether separate acts constitute a single claim. The first factor is the time between instances of harassment—a "significant gap" of time can "sever the hostile work environment claim." *Id.* at 852. The court noted that "there is no magic number; the question is whether 'the series of allegations describe continuous conduct rather than isolated incidents.'" *Id.* at 853 (quoting *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017). Second, "a change in managers can affect whether incidents are related." *Id.* Because supervisors have extensive control over working conditions, an employee under a new supervisor "might well experience different hostile environments." *Issacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007). Third, an "intervening action" taken by the employer can sever the hostile work environment claim. As an example, the Seventh Circuit pointed out that disciplinary action—particularly the removal of a problematic supervisor—will often be enough to sever a hostile work environment claim. *Ford*, 942 F.3d at 853–54.

In this case, the school district's decision to remove Fare from his position was such an intervening event. As mentioned above, the Seventh Circuit has recognized that the permanent removal of an alleged harasser constitutes an intervening event for *Morgan* purposes, especially if the removal was designed to put an end to instances of harassment. *See id.*, 942 F.3d at 854 ("We agree that removing the alleged harassers permanently . . . can bring an end to the unlawful employment practice at issue."). The court sees little reason to depart from the Seventh Circuit's guidance here. While it is questionable that Fare's removal was designed to address Plaintiff's complaints, the results of the internal investigation—combined with the official justifications given by Slife and Phillips—strongly suggest that Fare's hostile treatment of his subordinates was a cause of his termination. Even if Defendant would be liable for failing to address Fare's

16

harassment of Plaintiff, the decision to remove him from his position put an end to that unlawful employment act. Since Fare was removed prior to the 300-day period that began on January 12, 2022, the consideration of his harassment is barred by the ADA's statute of limitations.

Thus, Plaintiff must make his case based on discrete acts that occurred no earlier than January 12, 2022. Plaintiff points to just two such acts: (1) the denial of reimbursement for tools, and (2) the failure to provide him with accommodations after going on sick leave. Neither is sufficient to establish that the atmosphere was hostile. The school district had an obvious and logical nondiscriminatory explanation for refusing to reimburse an employee for tools purchased while on leave. With respect to the alleged failure to accommodate, Plaintiff never requested any accommodations after January 12, 2022—so there was nothing for Defendants to deny. Because these two occurrences do not constitute the serious and pervasive environment necessary to sustain a hostile work environment claim, summary judgment is appropriate on Count I.

Plaintiff cites *King v. Aramark Servs. Inc*, 96 F.4th 546, 560 (2d Cir. 2024), for the proposition that "the termination and denial of benefits contributed to the discrimination and renders timely the entire chain of events." (Opp. [81] at 20.) By this, he evidently means that the statute of limitations "should be considered to reaccrue each day [the violation] continues." (*Id.*). But *King* also observed that an "unrelated discrete act, different in kind from the conduct giving rise to the hostile environment, does not trigger the continuing violation doctrine." *King*, 96 F.4th at 56. (*See also* Reply [86] at 11.) As discussed above, the employment violation at issue ended with the school board's removal of Fare from his supervisory position, and Plaintiff brought his action more than 300 days after Fare's removal—so *King* does not support his position.

### B. Failure to Accommodate

Plaintiff also alleges that Defendant violated the ADA by failing to grant him an accommodation for his disability. An employer violates the ADA if it fails to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified person with a disability." 42 U.S.C. § 12112(b)(5)(A). To survive summary judgment on a failure to

accommodate claim, a plaintiff must show "(1) he was a qualified individual with a disability, (2) the employer was aware of his disability, and (3) the employer failed to reasonably accommodate his disability." *Williams v. Bd. of Ed. of City of Chicago*, 982 F.3d 495, 503 (7th Cir. 2020).

Plaintiff has identified three alleged instances of failure to accommodate: the first stems from Fare's alleged denial of his flex breaks in April 2021, the second from Fare's alleged denial of his medical leave in May 2021, and the third from Defendant's failure to reach out to Plaintiff after he went on disability leave in September 2021, and before his resignation in September 2022, regarding a different job and accommodations. Of these, the first two occurred prior to January 12, 2022, and thus are barred by the statute of limitations. *See infra* at 18.

As to the third, even if it was timely,[11] the facts alleged are not sufficient to survive summary judgment. Plaintiff went on leave in September 2021 and never made a request for workplace accommodations after that date. (Pl. Resp. to DSOF ¶ 69.) Instead, he expected Defendant to reach out to him to initiate the accommodations discussion. (*Id.*) Liability for failure to accommodate may arise when an employer refuses to engage in an "interactive process" with an employee to determine reasonable accommodations, but "the regulations envision an interactive process that requires participation by both parties." *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Furthermore, "[w]here the missing information . . . can only be provided by one of the parties, . . . the party withholding the information may be found to have obstructed the process." *Id.* at 1136 (affirming grant of summary judgment in favor of or an employer who never knew what action it had to take and never failed to respond to an employee's request for accommodation).

Defendant had no affirmative obligation to grant Plaintiff an accommodation he never requested, and for which he never suggested a need. Even now, Plaintiff does not specifically name an accommodation that would have allowed him to return to work. (*See generally Opp.*)

---

[11] As Plaintiff never actually requested an accommodation, and Defendant never formally denied one, there is no reference date to determine whether the claim is timely.

Because no reasonable jury could find that Defendant unlawfully failed to accommodate, summary judgment is also appropriate on Count II.

### C.     Retaliation

A plaintiff may establish a retaliation claim through a direct or indirect approach. *Williams*, 982 F.3d at 508. Under the indirect approach, most applicable here, a claimant must show: "(1) he engaged in protected activity; (2) he suffered a materially adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity." *Id.* at 509 (quoting *Boss v. Castro*, 816 F.3d 910 (7th Cir. 2016)). If the Plaintiff meets this burden, the burden shifts to the employer to present a legitimate, non-retaliatory purpose for its action. *Id.* The Plaintiff must then prove the employer's reason is pretextual. *Id.*

Plaintiff points to several examples of retaliation, but almost all relate to Fare: he points to Fare's negative performance review, Fare's alleged refusal to allow Plaintiff flexible breaks or time off in advance for medical appointments, his direction to Plaintiff to stop fixing the bus wash, and the alleged false report that Plaintiff had refused to work. (Opp. [81] at 9–12.) Plaintiff had no contact with Fare after June 2021 and was no longer working himself as of September of that year.[12] Each of these claims are barred by the ADA's statute of limitations for the same reasons as discussed above, so the court does not need to address their merits. *See Morgan*, 536 U.S. at 118.

---

[12]     Like a hostile environment claim, a retaliation claim may be based on the accumulation of several retaliatory actions rather than centering on one single incident. *See, e.g.*, *Alamo v. Bliss*, 864 F.3d 541 (7th Cir. 2017). The Seventh Circuit has recognized the possibility of a claim of retaliatory harassment, *see, e.g.*, *Knox v. State of Ind.*, 93 F.3d 1327 (7th Cir. 1996), but the standards for evaluating such claims are akin to those that govern hostile work environment claims. *See, e.g.*, *Boss v. Castro*, 816 F.3d 910, 919–21 (7th Cir. 2016). Thus, if the tool reimbursement claim could be said to be an act of retaliation at all, it would not relate sufficiently to Fare's misconduct to render claims relating to that misconduct timely.

The lone surviving allegation of retaliation relates to Plaintiff's complaint about denial of his tool allowance in July 2022. Several elements of retaliation are disputed, but the court need only address one: Plaintiff asserts that Defendant had provided tool reimbursement for employees during vacation and during the COVID-19 lockdown—but Plaintiff presents no evidence that Defendant provided reimbursement for a similarly situated employee on extended medical leave. Unlike Plaintiff, the employees on vacation and COVID-19 intended to return to work and thus intended to use their tools for work after returning to the workplace. And Defendant communicated to Plaintiff that he, too, would receive reimbursement, were he to return to work. (DSOF ¶ 65.) Plaintiff has not rebutted Defendant's showing that the denial of reimbursement was based on a legitimate policy unrelated to retaliation: that an employee on extended leave, with no planned date to return to work, was not entitled to tool reimbursement. (DSOF Ex. 10 [70-10].) Defendant is entitled to summary judgment on Plaintiff's claim of retaliation.

### D.    Constructive Discharge[13]

Plaintiff also alleges that he was constructively discharged. There are two types of scenarios for such claim. *Fields v. Bd. of Ed. of City of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019). The first type "occurs when a plaintiff resigns due to discriminatory 'working conditions even more egregious than that required for a hostile work environment claim.'" *Id.* (quoting *Wright v. Ill. Dep't of Children and Family Servs.*, 798 F.3d 513, 527 (7th Cir. 2015). The second type occurs whenever "an employer acts in a manner that would make clear to a reasonable employee that she will be immediately fired if she does not resign." *Id.* Another way of understanding this second

---

[13]    Count IV is stylized as "constructive discharge." Defendant argues that this count is "moot" because it "contains merely a theory to support an adverse employment action rather than an independent cause of action." (Mem. [86] at 12.) As this court previously explained:

> Count IV contains plaintiff's allegations that defendant's discriminatory and retaliatory conduct resulted in the adverse employment action of a constructive discharge. A complaint may set out two or more statements of a claim, alternatively, either in a single count or in separate counts . . . Use of a separate count is allowable though unnecessary. (Mem. Op. [44] at 4.)

type of constructive discharge is that the employer's actions demonstrate that "the handwriting was on the wall and the axe was about to fall." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998)).

The statute of limitations does not begin running for a constructive discharge claim until after the employee's actual discharge. *Green*, 578 U.S. at 556. Because the actual discharge occurs when the employee provides notice of his resignation to the employer, *id.* at 563–64, Plaintiff's EEOC charge, filed two months after his September 2022 resignation, was timely filed.[14] Moreover, even if Fare's hostile acts are themselves no longer actionable, Plaintiff may present evidence of those acts in support of his timely constructive discharge claim. *Morgan*, 536 U.S. at 113.

Even considering the full range of Plaintiff's complaints, however, he does not put forward enough evidence to survive summary judgment. Almost all of the conduct that Plaintiff points to as evidence of his constructive discharge occurred at the hands of Fare, and Fare was removed from his position in June 2021, and never returned to work. Plaintiff himself remained an employee of Defendant until more than a year later—he went on leave in September 2021, and resigned in September 2022. To make a claim of constructive discharge, a plaintiff must show that their working conditions are so "objectively intolerable" that no reasonable person would continue to work there. *See Fields*, 928 F.3d at 625. Plaintiff does not meet this standard. By the time he resigned, the primary instigator of his workplace troubles had been gone for over a year, and he does not adequately explain why Fare's departure was not sufficient to address his complaints.[15] Plaintiff's argument now appears to be that he did not know that Fare had

---

[14] Defendant argues the statute of limitations begins to run at the time when a plaintiff knew or had reason to know that defendant has discriminated against him, citing *Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132, 1143 (7th Cir. 1992). However, this case does not concern a constructive discharge claim, for which the Supreme Court later clarified the tolling period in *Green*.

[15] As discussed, Plaintiff clearly was not subject to hostile work conditions at the time he resigned—he had not spoken with Fare for over a year, and his interactions with coworkers

permanently departed, and feared that he would return to his position. But that abstract fear is not enough to support a claim of constructive discharge, particularly because Defendant took prompt corrective action whenever Plaintiff made an official complaint against Fare.

Likewise, the complaints Plaintiff raised after Fare's departure are insufficient to support this claim. As noted earlier, he alleges that Defendant denied to reimburse him for tools and that Defendant refused to reach out with accommodations. But as explained above, Defendant has provided a reasonable explanation for denying tool reimbursement, and had no obligation to offer accommodations that Plaintiff had never requested. Neither of these two matters rises to the level of the severe hostility required for a showing of constructive discharge. Summary judgment is appropriate.

## **CONCLUSION**

Defendant's motion for summary judgment [68] is granted with respect to all claims.

ENTER:

Dated: September 5, 2025

_____
REBECCA R. PALLMEYER
United States District Judge

---

while on leave did not offend him. Even if a jury could find that the work environment would have been sufficient to sustain a constructive discharge claim at the time of taking disability leave (when Fare had been gone from the workplace for three months), Plaintiff was surely not subjected to that environment at the time he resigned. Furthermore, if Plaintiff were to present the novel argument that his discharge actually occurred on the date he took disability leave rather than his resignation date, under a theory that taking leave functionally terminated his employment, that argument would doom his constructive discharge claim on timeliness grounds.